# UNITED STATES DISTRICT COURT
for the
District of Arizona

| | | |
|---|---|---|
| **In the Matter of the Search of** | | |
| *(Briefly Describe the property to be searched or identify the person by name and address* | | Case No. 22 - 8351 MB |
| A Black Samsung smartphone IMEI 3573888637483636; A Black Motorola Smartphone IMEI 351394590662369; and A Black Samsung Galaxy Smartphone IMEI 353955219473483, located at the FBI Phoenix office, 21711 N 7ᵗʰ St Phoenix, AZ | | |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the District of ___Arizona___.
(identify the person or describe the property to be searched and give its location):

**As further described in Attachment A.**

The person or property to be searched, described above, is believed to conceal (identify the person or describe the property to be seized):

**As set forth in Attachment B.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

YOU ARE COMMANDED to execute this warrant on or before ___10-27-22___.
*(not to exceed 14 days)*

☒ in the daytime 6:00 a.m. to 10 p.m.
☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to the United States Magistrate Judge on duty in the District of Arizona.

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized (*check the appropriate box*)   ☐ for 30 days (*not to exceed 30*)
☐ until, the facts justifying, the later specific date of _____.

Date and time issued: ___10/13/22   4:12 pm___          _____
*Judge's signature*

City and State: ___Phoenix, Arizona___          ___Honorable John Z. Boyle, U.S. Magistrate Judge___
*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

This warrant applies to the following electronic devices:

1. Recovered from the possession of D.A.  The device was initially collected by the Gila River Police department and provided the device to the FBI:

(1) A Black Motorola Smartphone IMEI 351394590662369




2. Recovered from the possession of J.L.  The device was initially collected by the

Gila River Police department and provided the device to the FBI:

(1) A Black Samsung Galaxy Smartphone IMEI 353955219473483

 



3.    Recovered from the possession of ADRIAN SULLIVAN.   The device was

initially collected by the Gila River Police department and provided the device to the FBI:

(1) A Black Samsung smartphone IMEI 357388863748636




## ATTACHMENT B

All records and communications relating to the violation of Title 18, United States Code, Sections 1153 and 1111, Murder:

    a.  Telephone numbers of incoming/outgoing calls stored in the call registry;

    b.  Telephone numbers and email addresses and corresponding names to those numbers and addresses stored in the address book;

    c.  Any incoming/outgoing text messages and instant messages;

    d.  Telephone subscriber information;

    e.  Any other electronic information in the stored memory and/or accessed by the active electronic features of the digital or cellular telephone, including but not limited to e-mail, voicemail, and photos; and,

    f.  Global Positioning System (GPS) coordinates or any other location data stored within the device.

# UNITED STATES DISTRICT COURT

for the
District of Arizona

| In the Matter of the Search of | |
|---|---|
| *(Briefly Describe the property to be searched or identify the person by name and address)* | |
| A Black Samsung smartphone IMEI 3573888637483636; A Black Motorola Smartphone IMEI 351394590662369; and A Black Samsung Galaxy Smartphone IMEI 353955219473483, located at the FBI Phoenix office, 21711 N 7th St Phoenix, AZ | Case No. 22-8351MB |

## APPLICATION AND AFFIDAVIT FOR A SEARCH WARRANT

I, Det. Kyle Weeden, a federal law enforcement officer, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property (*identify the person or describe the property to be searched and give its location*):

### As further described in Attachment A.

Located in the District of __Arizona__, there is now concealed (*identify the person or describe the property to be seized*):

### As set forth in Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

 X evidence of a crime;
   contraband, fruits of crime, or other items illegally possessed;
   property designed for use, intended for use, or used in committing a crime;
   a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code/Section | Offense Description |
|---|---|
| 18 U.S.C. §1111 | Murder |

The application is based on these facts:

### As set forth in Attachment C, incorporated herein by reference.

☒ Continued on the attached sheet.
☐ Delayed notice of ___ days (give exact ending date if more than 30 days: _____) is
   requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA Raynette Logan *RP*
*Telephonically Sworn*

_____
*Applicant's Signature*

Kyle Weeden, Detective, Gila River Police Department
*Applicant's printed name and title*

Date issued: __10-13-22   4:12pm__

_____
*Judge's signature*

City and State: Phoenix, Arizona

Hon John Z. Boyle, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

This warrant applies to the following electronic devices:

1. Recovered from the possession of D.A.  The device was initially collected by the Gila River Police department and provided the device to the FBI:

(1) A Black Motorola Smartphone IMEI 351394590662369




2. Recovered from the possession of J.L.  The device was initially collected by the Gila River Police department and provided the device to the FBI:

(1) A Black Samsung Galaxy Smartphone IMEI 353955219473483

 



3.     Recovered from the possession of ADRIAN SULLIVAN.  The device was initially collected by the Gila River Police department and provided the device to the FBI:

(1) A Black Samsung smartphone IMEI 357388863748636

 

## ATTACHMENT B

All records and communications relating to the violation of Title 18, United States Code, Sections 1153 and 1111, Murder:

a.  Telephone numbers of incoming/outgoing calls stored in the call registry;

b.  Telephone numbers and email addresses and corresponding names to those numbers and addresses stored in the address book;

c.  Any incoming/outgoing text messages and instant messages;

d.  Telephone subscriber information;

e.  Any other electronic information in the stored memory and/or accessed by the active electronic features of the digital or cellular telephone, including but not limited to e-mail, voicemail, and photos; and,

f.  Global Positioning System (GPS) coordinates or any other location data stored within the device.

**ATTACHMENT C**

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

I, Kyle Weeden, Detective with the Gila River Police Department ("GRPD"), being duly sworn, depose and state as follows:

**INTRODUCTION**

The facts of this case, as more fully detailed herein, are that on or about August 17, 2022, within the confines of the Gila River Indian Community ("GRIC"), within the District of Arizona, ADRIAN SULLIVAN (hereinafter referred to as SULLIVAN), killed A.M at the Sacaton Gun Range located at Casa Grande Highway and E Gun Range Trail Sacaton, Arizona (within the exterior boundaries of the Gila River Indian Community), thereby violating federal law by committing 1st Degree Murder, in violation of Title 18, United States Code, §§ 1153 and 1111. Further investigation resulted in the recovery of a Black Samsung smartphone IMEI 357388863748636; A Black Motorola Smartphone IMEI 351394590662369; and a Black Samsung Galaxy Smartphone IMEI 353955219473483. The owner of the Black Samsung smartphone IMEI 357388863748636, was identified as SULLIVAN. The owner of the Black Motorola Smartphone IMEI 351394590662369 was identified as D.A. And the owner of the Black Samsung Galaxy Smartphone IMEI 353955219473483 was identified as J.L. The aforementioned phones were seized by the Gila River Police Department (GRPD) and are currently located at the FBI Phoenix Office, 21711 N. 7th Street, Phoenix, AZ 85204.  I am requesting that the Court issue a search warrant to search for evidence located in the cell phones in support of an investigation into the aforementioned crime.

**PRELIMINARY BACKGROUND INFORMATION**

1.      Your affiant is a graduate of the Northern Arizona Regional Training Academy in Prescott, AZ. Your affiant has been employed with the GRPD since February 2018. Your affiant is currently

assigned to the Criminal Investigations Division, Violent Crimes Unit and has primary investigative responsibility in the area of violent crime, to include homicide, robbery, arson, and aggravated assaults.

2.    Your affiant has obtained a Special Law Enforcement Commission through the Bureau of Indian Affairs. As such, your affiant is a law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and is thereby authorized to execute arrest and search warrants under the authority of the United States.

3.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, officers, investigators and witnesses. This affidavit is intended to show merely there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. I have set forth only the facts I believe are necessary to establish probable cause to believe evidence of a violation of Title 18, United States Code, §§ 1153 and 1111, is located within certain electronic devices seized during the investigation of the crime scene on August 17, 2022, more fully described in Attachment A, for items listed in Attachment B.

4.    This Court has jurisdiction over these offenses under 18 U.S.C. § 1153 because the below-described events occurred on the GRIC, a federally recognized tribe, and SULLIVAN and A.M are enrolled members of the Gila River Indian Community.

## DETAILS OF INVESTIGATION

5.    On August 17, 2022, at approximately 0030 hours, I was contacted by Gila River Police Department (GRPD) A/Sgt. J. Vargas. Sgt. Vargas directed me to respond to the Gila River Indian Community (GRIC) gun range, located at Casa Grande Highway and East Gun Range Trail Sacaton, AZ (within the exterior boundaries of the Gila River Indian Community) to assist with a possible homicide investigation.

2

6.      Upon arrival, I met with the initial responding GRPD officer, GRPD Officer B. Kisto, who provided the following in summary:

7.      On August 17, 2022, at approximately 0011 hours, the Gila River Public Safety Dispatch (Dispatch) received a 911 call from an anonymous reporting party (RP). The RP stated there was an unresponsive male subject lying in the middle of the old Gila River Indian Community Gun Range. Gila River Police Department (GRPD) Officers arrived on scene and located the male subject, later identified as A.M. The officers checked A.M. for life signs but were unable to locate any. Rigidity was also beginning to set in and lividity was observed on the body. While Officers were checking for life signs, they located a small puncture wound, consistent with a gunshot wound, near A.M.'s left armpit. Once the gunshot wound was located and A.M. was confirmed deceased, the officers contacted the GRPD Investigative team, consisting of GRPD Detectives and Crime Scene Specialists (CSS), to respond. GRPD Officers were also able to determine an approximate location of the reporting party (RP.) After canvassing the area, which was located approximately 2 to 3 miles from the incident location, GRPD Officers were able to locate and identify the RP as J.L. J.L agreed to go with the officers to the GRPD station until investigators could speak with her.

8.      Once I finished speaking with Officer Kisto, I stood by until the remaining investigative team arrived on scene. Once the investigative team arrived, we conducted a walkthrough of the crime scene. While walking through the crime scene, we observed A.M. lying face up on the ground. Located near A.M. were shoe impressions leading to the body with a zig zag formation and Adidas logo near the rear of the sole.  While examining the scene, I was advised by the Crime Scene Specialists they located a second set of shoe impressions they believed had a diamond pattern and were small sized shoes, similar to the average female shoe size. We also observed a small puncture wound near A.M.'s left armpit consistent with a gunshot wound from a small caliber handgun. Surrounding the body were multiple .22

3

caliber spent casings and 9mm spent casings. Based on my training and experience, the spent casings appeared have been on the ground for less than 48 hours. There were also tire impressions leading away from the body. No vehicles or other subjects were located in the area.

9.     During the course of the investigation, GRPD Detectives located and interviewed multiple subjects connected to A.M. Detective J. Hatley contacted E.C. E.C. told Det. Hatley that on August 16, 2022, at approximately 2300 hours (approximately 1 hour prior to when A.M. was found deceased), A.M. came to her residence. A.M. asked E.C. if he could borrow her car, a faded Gold in color 1997 Nissan Maxima. E.C. allowed A.M. to borrow her car, and A.M. left with the car. As A.M. was leaving, A.M. told E.C. that he was going to try and make amends with two subjects named D.A. and M.M. E.C. advised that the license plate on the vehicle (Arizona License Plate ANY2562) was registered to J.J., which belonged to a different vehicle. E.C. provided a Vehicle Identification Number for the vehicle A.M., which is VIN JN1CA21DXVMS507577. Detective Hatley also contacted A.M.'s parents, J.M. and A.M. They stated A.M had come to their house on August 16, 2022, between 2300 and 2330 hours, before leaving in a possible grey or silver car. Among those contacted at A.M.'s parents' house was his brother-in-law, J.D. J.D. informed Detective Hatley he had received a text message from A.M. stating he needed help at approximately 2130 hours on August 16th. No further messages were received, and the message did not elaborate on what kind of help was needed.

10.   While the rest of the investigative team were conducting their interviews, A/Sgt. Vargas and I responded to the GRPD main station to interview J.L. While asking J.L. questions, she provided the following information. J.L. stated she was in Casa Grande with her cousins at a liquor shop she referred to as "Saigon." J.L. stated the liquor shop was a Chinese shop located along Pinal Ave just past a restaurant called Vaqueros. Further investigation at a later time showed there was only one liquor store in the described area located near the intersection of N Pinal Ave and W Havasupai Dr in Casa Grande,

4

AZ called "Stop By Convenience Store." J.L. stated they were buying alcohol to continue drinking. J.L. stated she and her cousins get together on the anniversary of J.L.'s sister's death to grieve. When asked, J.L. identified her cousins as J.A., A.A., and L.A. J.L. stated J.A. was the driver, and they had driven to Saigon in J.A.'s vehicle.

11.    After getting more alcohol from the store, the group got back in the vehicle to drive to Sacaton. During the drive, J.L. stated she got into an argument with her cousins and got out of the vehicle. J.L. stated the next thing she remembered was walking along the highway, along the overpass crossing the I-10, when a white small car stopped by her. J.L. stated the vehicle was occupied by only a male driver.

12.    When the vehicle stopped next to J.L., the driver asked J.L. where she was going. J.L. told the driver she was going to her home in Sacaton. The driver asked J.L. if she wanted a ride into Sacaton. J.L. stated she did not know the driver and normally would say no. However, this time J.L. accepted his offer and got into the vehicle.  During the drive J.L. stated she and the driver remained silent and did not talk. While the male subject was driving her to Sacaton, J.L. told the driver she needed to urinate. The driver pulled onto E Gun Range Trail and drove toward the old gun range. The road leading to the gun range was lined with numerous desert bushes and trees. The road continued toward the mountain for approximately 150 yards before reaching the gun range.

13.    When the driver stopped by the gun range, J.L. stepped out of the vehicle and saw the male subject lying on the ground in the gun range. J.L. stated she never moved away from the vehicle once she placed her feet on the ground. J.L. stated she thought he looked like her brother, Jaime Lugo, but the driver told her to get back in the car or get left behind. J.L. stated they never approached the subject or passed the fence line into the gun range. J.L. got back into the vehicle when the driver stated he was leaving. We asked J.L. if she thought the subject lying on the ground was her brother, why didn't she go

check on him. J.L. stated she did not want to get involved and wanted to leave. We asked J.L. if she was close to her brother, and she stated yes. We provided J.L. with a rough diagram of the gun range to include the road leading to the gun range, the fence surrounding the gun range and the gate in the fence. We asked J.L. to draw the location the vehicle was parked and where she walked. J.L. drew a square to indicate the vehicle and initially stated the car parked by a tree near the gate and was perpendicular to the gate. J.L. later corrected herself and stated the vehicle was actually slanted away from the gate and indicated the direction it was facing on the diagram. According to J.L.'s sketch the vehicle was slanted at approximately 45 degrees from the gate.

14.     We also asked J.L. why she didn't call 911 the moment she saw him. J.L. stated she wanted to call 911, however the driver told her to wait until he dropped her off. J.L. stated the driver dropped her off at her boyfriend's house and left. J.L. stated she contacted her boyfriend, A.J., at the house and told him what happened. A.J told J.L. that she needed to call 911 so J.L. called 911.

15.     After taking J.L.'s statement and completing the interview with J.L., we asked her if she had her phone with her the entire time. J.L. stated yes and pulled out a Black smart phone with a cracked screen. J.L. identified the phone as hers and stated it was the same one she was carrying during the incident. I also asked J.L. if I could look at the bottom of her shoes. The shoes J.L. were wearing were a pair of black Adidas shoes. The bottom of the shoes had diamond pattern tread. I asked J.L. if we could take her shoes as potential evidence, and she let us take her shoes. We also explained to J.L. that we believed her cell phone may contain data pertinent to the investigation, including tracking information to show the path she took. We asked J.L. if she would allow us to hold the phone until the data could be extracted. J.L. stated no. A tribal search warrant was drafted requesting permission to search J.L.'s person and seize any cellular devices in her possession. GRIC Judge Janice Breckenridge granted the search warrant. Once the search warrant was granted, a copy was provided to J.L. Once J.L. read through the

search warrant, J.L. provided us with the phone, a Black in color Samsung Galaxy smartphone IMEI 353955219473483, without further incident. Both the shoes and phone were secured in the GRPD Evidence Department.

16.     On August 17, 2022, the Pinal County Medical Office (M.E.) conducted an autopsy of A.M. During the autopsy, Dr. Hu confirmed A.M.'s manner of death was homicide due to a single gunshot wound. Dr. Hu also confirmed A.M. was likely shot with a small caliber handgun that entered through his left arm pit and perforated multiple organs causing massive internal bleeding.

17.     On August 17, 2022, I conducted a follow up interview to verify J.L.'s statement. During the follow up investigation, I was able to contact J.L.'s cousins J.A. and L.A. Both subjects denied being with J.L. on August 16th. J.A. stated she was at her home all day due to being under quarantine for medical reasons, and J.L. stated she was working during those hours. Both subjects also advised it had been approximately one (1) year since they had last seen J.L.

18.     While conducting my interviews, GRPD Detective J. Greeley and Detective P. Cuellar conducted follow up investigations to locate the "Saigon" store. The detectives were able to locate Saigon, and identified the store as the "Stop By Convenience Store", located at 10175 N Pinal Ave Casa Grande, AZ. Detective Greeley and Detective Cuellar stated they had contacted the store owners as well. The store owners stated on August 16, 2022, they had to close the store early, at 2100 hours, due to a family emergency.

19.     During the course of the investigation, GRPD detectives issued an attempt to locate notice to the National Crime Information Center (NCIC) database for the 1997 Nissan, due to the vehicle still being outstanding. On August 18, 2022, at approximately 1600 hours, GRPD dispatch received a call from a subject who identified herself as D.M., who said she observed the 1997 Nissan driving along the Sacaton roads. Officers searched the area and located the reported vehicle. Officers confirmed the

vehicle was the vehicle A.M. borrowed the night of his death by the AZ license plate on the vehicle and matching description. GRPD Officers C. Ward, D. De La Rosa and Commander M. Duarte followed the vehicle until it came to a stop at a house in Sacaton, AZ (within the exterior boundaries of the Gila River Indian Community). Through past records and calls for service, the officers were able to confirm the house was the residence of D.A. Once the vehicle was stopped, officers contacted a male subject in the driver seat, identified as SULLIVAN. SULLIVAN was confirmed as the sole occupant of the vehicle and detained. Detective Greeley and I responded to the scene to continue the investigation. The vehicle was seized as evidence and transported to the GRPD evidence impound lot, where it remains. SULLIVAN was transported to the GRPD station for further questioning by detectives.

20.     Prior to going to the GRPD station, Detective Greeley and I contacted and interviewed D.A., who was living at the residence where SULLIVAN was located.  D.A. provided her date of birth as well as a cell phone number.  D.A. stated that her phone was missing and that she believed a friend may have walked off with it by accident.  I provided the Miranda Warnings to D.A. utilizing a department issued Miranda Warnings card. After reading the card, I asked D.A. if she understood her rights, and she stated yes.

21.     I explained to D.A. why we wanted to talk to her and asked her where she was Tuesday, August 16th, between 2100 hours and midnight. D.A. stated she was at her residence the whole time. I asked D.A. to confirm if she was at the house the whole time. D.A. stated she was with one of her friends, Paul, at the "Amphitheatre." Based upon my experience working in the community, "Amphitheater" refers to an outdoor theatre located directly behind the Boys and Girls Club, located at 80 E Seed Farm Rd Sacaton, AZ. D.A. stated she met her friend at the Amphitheater at approximately 2345 hours. D.A. stated she utilized the Facebook Inc. social media platform "Messenger" app to communicate with Paul. During the interview, D.A. stated the Messenger app was her main mode of communication.

8

22.	D.A. stated her profile ID was "DVN L Antone." D.A. stated she messaged Paul first and asked him if he wanted to hang out at the Amphitheater because she had something she needed to talk to him about. D.A. initially stated she was alone in the house, however, she quickly amended her statement and advised M.M. was at the house with D.A.'s mother and D.A.'s children.

23.	D.A. explained she left her house at approximately 2345 hours. When she got to the Amphitheater, she looked at her phone and noticed it was approximately 0002. D.A. stated she returned to the house at approximately 0400 hours. I asked D.A. if the phone she checked was the same phone that went missing. D.A. stated yes. D.A. stated Paul had left in the morning, and she noticed her phone was missing. D.A. stated Paul had a similar phone and probably grabbed hers by mistake. D.A. initially stated she did not bother asking him for the phone. However, she amended her statement and advised she did message Paul about the phone, and he denied taking it.

24.	D.A. stated they were at the Amphitheater for 10-15 minutes before walking over to her brother's girlfriend's house. When they arrived, no one answered the door, so they walked back to the Amphitheater. When they got back to the Amphitheater, they saw another male subject there. D.A. stated she recognized the subject as her late boyfriend's best friend, D.M. I asked D.A. if they spent the rest of the time talking at the amphitheater. D.A. stated they were there for approximately 15 minutes before making their way back to D.A.'s house. D.A. stated Paul left later that morning, which was when she noticed her phone was missing. During the interview, D.A. also stated she had a second phone that was out of service.

25.	D.A. confirmed she had a second phone, but that it was used only for Wi-Fi connection since it did not have a sim card. D.A. stated it was a smartphone she utilized to access the internet and Facebook messenger through Wi-Fi connections. D.A. also advised the phone was a Motorola smartphone and did not have an associated phone number due to no sim card being connected.

9

26.       D.A. stated they returned to the house at approximately 0430 hours. D.A. stated David left the house at approximately 0500 hours, and Paul left at approximately 0700 hours. I returned the topic to when D.A. was communicating with Paul. D.A. stated she would communicate with Paul through the Facebook Messenger app. D.A. stated she believed Paul's Facebook profile was either "Anthony Paul" or "Anthony Paul Jr." I asked D.A. if her profile was connected to Paul's profile as a "Friend." D.A. initially stated no, but quickly corrected her statement and advised Paul had sent her a "Friend Request" that she accepted.

27.       D.A. stated she recently met A.M. a few months back when M.M. had brought him over to the house a couple times. Since then, D.A. stated A.M. "comes around every now and then." D.A. initially stated A.M. would come to hang out when M.M. was at the house. However, D.A. amended her statement and advised A.M. would contact her if he could not get a hold of M.M. to hang out. D.A. stated that all three of them (D.A., A.M. and M.M.) were friends/acquaintances. D.A. stated that A.M.  had been around a lot lately.  D.A. stated A.M. was at her house three nights ago. It should be noted the day we contacted D.A. was on August 19th, which would have made "three nights ago" August 16th, the date of the original incident.

28.       D.A. stated that three nights prior, A.M. accused her of being jealous over his relationship with M.M. D.A. stated she told him he was wrong, and she did not see him as relationship material. I asked D.A. if it was Tuesday morning the argument took place. D.A. stated "Mm, that early morning." D.A. stated A.M. had left that early morning at approximately 0400 hours.

29.       D.A. changed her statement and stated the day A.M. left the house at approximately 0400 hours was Monday morning. D.A. stated on either Saturday (August 13th) or Sunday (August 14th), A.M. gave D.A. and M.M. a ride to the Fry's grocery store, located on Riggs Rd in Chandler, AZ, between 1900 hours and 2000 hours. D.A. stated A.M. was driving his mother's vehicle, a black Dodge

sedan. After they finished shopping, D.A. stated all three returned to her house at approximately 2200 hours. A.M. dropped off M.M. and D.A. and went back to his parent's house to return their vehicle. After approximately 20-30 minutes, A.M. returned to the house and stayed at her house until Monday morning when the argument happened.

30.     During the argument, D.A. stated they were outside the house when A.M. gave D.A. his phone and told her to read a message on the phone. D.A. stated she did not look at the message because it was none of her business and threw the phone on the ground. A.M. got upset and responded by telling D.A. she didn't have to be so jealous. D.A. asked A.M. what he was talking about, and A.M. stated "of M.M. and me." D.A. stated she accused A.M. of making up stories in his head and went inside. D.A. stated they continued arguing inside the house. The argument continued until 0400 hours Monday morning when A.M. left D.A.'s house.

31.     D.A. stated another friend, SULLIVAN, came over to her house later that same day and showed D.A. multiple text messages sent to SULLIVAN from A.M. In the messages, A.M. told SULLIVAN that D.A. was hanging out with Paul and they did not know where D.A. was. A.M. told SULLIVAN he was worried about D.A. because she did not have her phone with her. D.A. stated on Tuesday that A.M. attempted to message her. D.A. sent A.M. the screen shots she got from SULLIVAN and told A.M. not to contact her again. A.M. responded to D.A. and told her he thought they were in a relationship because A.M. would flirt with D.A. and she would flirt back. D.A. stated she ended the conversation and told A.M. not to contact her again.

32.     D.A. stated after telling A.M. not to contact her anymore she realized her wallet was missing. D.A. stated she figured out the wallet must have been left in A.M's vehicle when he took them to the store. D.A. stated she messaged A.M. and asked him if the wallet was still in his mother's car. A.M. messaged D.A. and told her the wallet was being held by his aunt, AnnaM. D.A. stated that on

Tuesday morning, August 16th, she went with M.M. to AnnaM.'s house to retrieve the wallet. D.A. stated they went to the Aunt's house between 0900 and 1000 hours. D.A. stated they went to the house and contacted AnnaM, who provided her with the wallet. D.A. stated they left the moment they got the wallet. D.A. stated she did not see A.M., but she did message him to tell him she got the wallet. D.A. stated A.M. tried messaging her again. D.A. stated she had not had any contact with A.M. since.

33.     D.A. stated she was using "Messenger" to send and receive messages through her phone from SULLIVAN and A.M.  In my training and experience, I recognized 'Messenger" as a texting app utilized through the social media platform Facebook Inc. D.A. stated she had screen shots of the messages on her secondary cell phone.  D.A. also stated A.M. sent her multiple texts through "Messenger" on Tuesday attempting to apologize for the argument. D.A. stated the last message she received from A.M. was a simple "yo" on Tuesday evening at approximately 2100 hours.

34.     D.A. stated she just wanted me to be aware of all the lies A.M. had tried to tell SULLIVAN. D.A. stated it was all on the messages she took a screen shot of. I asked D.A. where the screenshots were, and she stated, "On the phone I have."

35.     I asked D.A. if we could seize her phone as evidence to download the screenshots and any relevant data. D.A. stated yes. Once the interview was completed, D.A. went back into the house and returned with a black smartphone. D.A. provided us with the phone, a black in color Motorola smartphone IMEI 351394590662369, and she advised it was the phone she used to send and receive messages. I asked D.A. if the phone required a password to access and she stated no. I secured the phone in my patrol unit and later secured the phone in the GRPD Evidence lockers.

36.     After concluding the interview, Detective Greeley and I went to the GRPD station to interview SULLIVAN. Upon arrival to the GRPD station, Det. Greeley and I went to the interview room and contacted the male subject who was driving the gold Nissan Maxima sedan. The male subject

12

identified himself as SULLIVAN.  We read SULLIVAN his Miranda Warnings utilizing a department issued Miranda Warnings card. SULLIVAN advised that he understood his rights.

37.    SULLIVAN stated he couldn't remember where he was on Tuesday evening, August 16, 2022.  When asked about the vehicle he was arrested in SULLIVAN stated a "homie" gave it to him. I asked SULLIVAN for the name of his "homie." SULLIVAN stated he did not want to give out any names. SULLIVAN said he couldn't remember when he had been given the vehicle. SULLIVAN stated he smokes Meth (methamphetamine) on a continuous basis which causes memory issues.

38.    SULLIVAN stated A.M. came to D.A.'s house and picked him up. SULLIVAN stated he was in the front passenger seat while A.M. was in the driver seat. SULLIVAN stated they stopped in the mountains, but he was unable to advise which mountain they were stopped near. SULLIVAN stated he only remembered they were smoking when he looked up at the moon and thought, "the moon looked pretty nice," before closing his eyes and waking up in the Sacaton East Cemetery, located approximately 1 mile north of the incident location. When SULLIVAN woke up in the cemetery he was in the driver seat of the vehicle Allen was driving, the gold Nissan Maxima, and Allen was no longer with him.

39.    During the interview SULLIVAN stated he had a gun with him prior to stopping at the mountain. When Sullivan woke up at the cemetery he was alone in the car and his gun was missing. SULLIVAN went on to describe the gun as a "peashooter." SULLIVAN stated the gun fired live ammunition, but only "small little ones." While speaking with SULLIVAN about the location of the gun, SULLIVAN became silent before muttering, "I'm sorry, Steph. I'm sorry, D.A. I'm sorry, Leah. Sorry, Lex. Sorry, Dad. Sorry, everybody. I fucked up again…" Once the interview was complete SULLIVAN was taken into custody and booked into the GRIC Department of Rehabilitation and Supervision (DRS) on one count of homicide.

40.        While going through the booking process SULLIVAN was provided a new set of

13

clothes and slippers. The clothes he was currently wearing were placed in a temporary storage at the DRS, with the exception of his shoes. Once the shoes were removed, I noticed they were a pair of black Adidas shoes. I examined the soles of the shoes and noticed the pattern on the shoes matched the shoe impressions located near A.M.'s body. The size of the shoes also appeared to be the same. I seized the shoes as evidence. When SULLIVAN was originally arrested, he was located in possession of a black Samsung smart phone, IMEI 357388863748636 which he confirmed was his. While booking SULLIVAN into DRS, he asked if he could retrieve a phone number from his phone. SULLIVAN was provided the phone. While I was watching SULLIVAN, I observed prior to unlocking the phone, he tapped on the lock screen and pulled up a Facebook messenger app icon. SULLIVAN then quickly moved the icon to a delete button and deleted the Messenger App from his phone before I could take the phone back. The phone was seized as evidence. Both the phone and shoes were later secured in the GRPD evidence department.

41.     On August 24, 2022, I received an email from the DRS Chief Administrator Ron Lopez. In the email Director Lopez advised he received a memo from one of the Correction Officers, Ofc. Jose Ponce, concerning comments SULLIVAN made to Ofc. Ponce. On August 22, 2022, Ofc. Ponce was conducting a classification interview with SULLIVAN. During the interview, SULLIVAN informed Ofc. Ponce he was told by D.A. that A.M. had recently raped her in front of her children. SULLIVAN stated he drove to the Sacaton fire range (gun range) and got into a verbal altercation with A.M. over the rape allegations. While struggling with A.M., SULLIVAN stated he pulled out a "small piece" from his pocket and shot A.M. in the armpit.

## CONCLUSION

42.     Based on my training and experience, consultation with other law enforcement officers, and all of the facts as set forth in this affidavit, there is sufficient probable cause to believe a violation of

14

Title 18, U.S.C., § 1153 and 1111, Murder, has been committed, and evidence of the crime will be found in the cell phones described in this Affidavit and Attachment A. I believe that names, nicknames, and/or telephone numbers of other subjects involved in, and associated with the murder, as well as data describing the time, date, the duration of incoming and outgoing calls to the cellular phones, incoming and outgoing text messages, and other electronic data as listed in Attachment B, will be located on the electronic devices. Wherefore, your affiant respectfully requests a warrant be issued authorizing law enforcement to examine, analyze, and make record of the contents of the information stored in the seized cell phones described in this Affidavit and Attachment A, which is presently in the custody of the FBI. This affidavit was sworn telephonically before a United States Magistrate Judge legally authorized to administer an oath for this purpose.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 10-13-22

Detective Kyle Weeden
Gila River Police Department

Subscribed and sworn to before me this 13th day of OCT, 2022.

Honorable John Z. Boyle
United States Magistrate Judge
District of Arizona

15